**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § | |
| v. | § § | |
| JUAN RAUL ESPARZA, | § § | No. SA-17-CR-342(2)-XR |
| *Defendant.* | § § § § § | |

**ORDER**

On this day came on to be heard Defendant's motion to suppress. The Defendant Juan Raul Esparza is charged with: (1) conspiracy to distribute and possess with intent to distribute a controlled substance, which offense involved 500 grams or more of a mixture or substance containing a detectable amount of cocaine, (2) aiding and abetting possession with intent to distribute a controlled substance, which offense involved 500 grams or more of a mixture or substance containing a detectable amount of cocaine, and (3) possessing a firearm (380 Caliber semi-automatic pistol) in furtherance of a drug trafficking crime.

Defendant filed a motion for a *Franks* hearing and motion to suppress. In that motion he complains of the following: (1) he was subject to a warrantless search which resulted in the seizure of the pistol; (2) he was arrested and subjected to questioning without any *Miranda* warnings being given; and (3) the detective signing the affidavit in support of the search warrant issued for the search of a hotel room made false statements in the affidavit.

Hearings were held on August 15 and August 31, 2017.

**Background**

On April 4, 2017, San Antonio Police Detective Phillip Bourcier received information from a confidential source ("CS") that "Raul" [later identified as co-defendant Raul Lopez] was looking for buyers to purchase kilos of cocaine. That same day it was arranged for the CS to meet Lopez and negotiate a purchase of cocaine. Lopez agreed to sell the CS four ounces of cocaine as a sample for the future purchase of 5-10 kilos. Ultimately on April 13, Lopez called the CS and told him that he had 5 kilos of cocaine available for $135,000. Lopez and the CS agreed to meet on April 17 at a hospital parking lot in the Stone Oak area of San Antonio. Law enforcement officers conducted surveillance of the parking lot. Lopez told the CS that he had 3.5 kilos of cocaine (not 5) and would sell the 3.5 kilos for $94,500. Lopez said he needed to go to a different part of San Antonio (Ingram Park Mall area) to get the drugs from a hotel. Lopez was followed by police officers to the Marriott Residence Inn near the mall, where Lopez was seen by police officers entering the hotel. Lopez and Esparza were thereafter seen walking out of the hotel together. Lopez was seen to be clutching his jacket as if trying to prevent something from dropping. Lopez got into a White Tahoe and Esparza entered into a Black Durango. Lopez drove to an At Home parking lot nearby, a location that was previously arranged to be the meeting spot between Lopez and the CS. Esparza drove to the same parking lot and parked in another area of the lot where he had a direct view of Lopez's vehicle.

The CS entered Lopez's vehicle and was shown half a kilo of cocaine. The CS told Lopez that he would inform another person to bring the purchase money for the agreed 3.5 kilos. Once the CS left Lopez's vehicle, Esparza drove his vehicle back to the hotel. He happened to park next to an undercover police vehicle, and when he exited his vehicle, SAPD Sergeant Garcia, wearing a tactical vest with POLICE emblazoned on the jacket, ordered Esparza at

gunpoint to raise his hands and get to the ground. The Sergeant asked whether Esparza was armed. Esparza admitted to having a pistol in his pocket. After securing the weapon and handcuffing Esparza, the Sergeant asked Esparza what hotel room he was in. Esparza replied 400. It is uncontested that Esparza had not been read any *Miranda* warnings to this point. Esparza was then placed into the back of a patrol vehicle.

Once Esparza was placed into a patrol vehicle, officers approached Lopez at the At Home parking lot and detained him. Lopez was asked if he had anything illegal in his vehicle. Lopez replied it was "under the seat." Half a kilo of cocaine was then seized.

At this time Det. Bourcier left the location and began to draft an affidavit in support of a search of the hotel room.

Back at the hotel parking lot, once Esparza was in the patrol vehicle, Sgt. Garcia went inside the hotel lobby and asked the registration desk employees what room the man detained outside was staying in. The hotel employees informed Sgt. Garcia that Esparza had been in room 400. Det. Garcia also testified that he was told by hotel employees that there may be another person in the room. A maintenance employee escorted Sgt. Garcia and two other officers to room 400. Sgt. Garcia testified that "we knocked on the door; we could hear somebody moving around in there."[1] Sgt. Garcia further testified that since he did not know what the person

---

[1] The maintenance employee, who testified at the suppression hearing, denied hearing any noise coming from the room. The maintenance employee also testified that when he was instructed to open the room by his General Manager, he asked the GM whether anyone else was in the room and was told by the GM that no one was there. The maintenance employee testified that he remained outside the room, but he heard noises that sounded like the police officers opening kitchen cabinet drawers and moving furniture. After staying outside the room for about five minutes, the maintenance employee testified he left and returned about twenty minutes later. At that time he testified that he saw a black sports bag in the room that he did not recall seeing earlier. The court finds that the maintenance employee's testimony was not credible. No police officer recalls the maintenance employee returning to room 400. More importantly, given the room was secured and the door closed, it was highly implausible that the maintenance employee saw a black sports bag when he allegedly returned to the scene 20 minutes later. Also, he

3

believed to be inside was doing, and because he failed to answer the door knock, exigent circumstances required entry into the room. The maintenance employee was directed to use his hotel pass to open the door and entry was made. Sgt. Garcia testified that another person was immediately seen reaching for a bag. That person (later identified as co-defendant Victor Manuel Gonzalez-Ibarra) was searched and a gun was found on his person. Police officers made a visual inspection of a closet, the bedroom, and bathroom to ensure that no one else was present in the room. Law enforcement officers contend that no search was made of the room and they awaited notification from Det. Bourcier that a warrant had been signed. According to the officers, once they were informed that a warrant had been signed, they conducted a search and discovered three kilos of cocaine in a duffel bag.

The affidavit in support of the search warrant for the hotel room was subscribed and sworn to before the Bexar County Magistrate on April 17, 2017 at 4:20 p.m. The judge signed the warrant also at 4:20 p.m.[2] Law enforcement officers, however, entered room 400 at approximately 2:22 p.m. The parties disagree what time a "search" of the room was conducted and a black bag opened to reveal three kilograms of cocaine. Defendant contends that this occurred immediately upon entry into the room or at least by 3:45 p.m. (a time indicated in a DEA Form).[3]

**Analysis**

**A.      Was Esparza under arrest when confronted in the hotel parking lot?**

---

couldn't have earlier noted the presence or absence of a black sports bag when the officers initially made entry into the room. Upon using his pass card to open the door, the maintenance employee always remained outside the room.
[2] Government's Exhibit 1 to August 15, 2017 suppression hearing.
[3] Defendant's Exhibit 3 to August 15, 2017 suppression hearing. Defendant also tendered exhibits indicating that various police vehicles left the hotel at 5:45 p.m. See Defendant's Exhibits 4-6. Defendant suggests that this indicates the search must have taken place prior to 4:20 p.m.

The Government contends that Esparza was not subject to a custodial interrogation, and thus no *Miranda* warnings were required when he was asked whether he had a weapon and was asked what hotel room he was in.

> A suspect is "in custody" for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest. Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave. The requisite restraint on freedom is greater than that required in the Fourth Amendment seizure context. The critical difference between the two concepts is that custody arises only if the restraint on freedom is a certain degree—the degree associated with formal arrest.
>
> Whether a suspect is "in custody" is an objective inquiry that depends on the "totality of circumstances."

*United States v. Ortiz*, 781 F.3d 221, 229 (5th Cir. 2015).

The officers had probable cause to believe that Esparza was acting as security for Lopez during the attempted drug sale at the At Home parking lot. He was ordered at gun point to lie on the ground and handcuffed when questioned. He was not at liberty to leave and the totality of the circumstances dictates that he was under formal arrest at that time.[4]

### B. Could the Sergeant ask Esparza if he was armed?

In *New York v. Quarles*, the Supreme Court held that based on the facts of a case, there was "a 'public safety' exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence, and that the availability of that exception does not depend upon the motivation of the individual officers involved." 67 U.S. 649, 655–56

---

[4] In addition, DEA SA Moreno's report indicates that Esparza was apprehended at the parking lot. Defendant's Exhibit 3 to August 15, 2017 hearing.

(1984). In this case police officers were aware that a drug transaction was being conducted that involved a large quantity of cocaine and the sale price was negotiated at almost $100,000. The police had seen Esparza walk out of the hotel lobby with Lopez and park at a location where he could observe the planned transaction. Further, the arrests of the suspects in this drug transaction were ongoing and the situation was volatile. The situation posed an imminent danger to the public safety and the officers at the scene. Based upon the police officers' training and experience, they recognized that Esparza was acting as security for the drug sale and that he was likely armed. *See also United States v. Roberson*, 20 F.3d 1171 (5th Cir. 1994) (recognizing the exception); *United States v. Benitez-Vergara*, No. 3:11-CR-0299-B, 2012 WL 3962614, at *6 (N.D. Tex. Sept. 11, 2012) (declining to find a *Miranda* violation because of the exception where "[the questioning agent] was justified in immediately questioning [the defendant] about the presence of firearms prior to reading him his *Miranda* rights. Such action was clearly reasonable to ensure [the agent's] safety and the safety of the other officers around him, given the exigent circumstances that existed at the time."). Accordingly, the "public safety" exception applies in this case and the Defendant's motion to suppress his answer to this question is denied.

**C. Could Sergeant Garcia ask Esparza what hotel room he was in and who else was in there? Does the inevitable discovery exception apply?**

Since Esparza was in custody, the questioning of what hotel room he was in violated *Miranda* and did not fall within the "public safety" exception. The questioning of who else was in the room may fall within the public safety exception, but the Court need not reach that determination because Sgt. Garcia independently discovered both pieces of information. Accordingly, suppression of the answers to these questions is not required.

For the inevitable discovery exception to the exclusionary rule to apply, the Government must prove by a preponderance of the evidence that "(1) there is a reasonable probability that the contested evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation." *United States v. Lamas*, 930 F.2d 1099, 1102 (5th Cir. 1991) (internal quotations omitted). Under the inevitable discovery doctrine, evidence initially seized improperly need not be suppressed if it would have been legitimately discovered pursuant to normal police practices. *United States v. Jackson*, 596 F.3d 236, 241 (5th Cir. 2010) (explaining that the inevitable discovery doctrine "renders the exclusionary rule inapplicable to otherwise suppressible evidence if that evidence would inevitably have been discovered by lawful means").

In this case all elements of the inevitable discovery exception have been satisfied. Sgt. Garcia approached the hotel staff and asked them what room Esparza had been staying in. Hotel staff informed him that he had been in room 400 and that there may be another person in that room. A hotel statement was secured that stated that Esparza was an occupant of the room.[5] This information was discovered pursuant to normal police practices. Defendant's motion to suppress this information is denied.

**D. Did exigent circumstances justify entry into the hotel room without a warrant?**

It is undisputed that law enforcement officers made entry into the hotel room prior to the search warrant being signed. The Government contends that exigent circumstances necessitated entry into the room to ensure that evidence would not be destroyed. In addition, the Government

---

[5] Government Exhibit 3 to August 15, 2017 hearing.

maintains that other than a protective sweep being done, there was no search executed until after the warrant was signed.

"A warrantless entry into a home is presumptively unreasonable. Exigent circumstances, however, may justify a warrantless entry. When a person is subjected to a warrantless search, the government has the burden of proving that the search was justified." *United States v. Silva*, No. 16-40167, 2017 WL 2589436, at *2 (5th Cir. June 14, 2017). In this case law enforcement officers had probable cause to believe that the cocaine was being stored in a hotel room. Lopez told the CS that the drugs were being held there. The hotel staff told agents that Esparza had been staying in room 400. Law enforcement agents stated there was concern that any occupant inside room 400 could have seen the arrest of Esparza in the hotel parking lot or otherwise become aware that Lopez was being arrested in the neighboring parking lot, and that person could have attempted to destroy the three kilos of cocaine that was presumed to be hidden in the hotel room. They knew that another person may have been in the hotel room because Esparza gave that information to officers when he was arrested. Independently, Sgt. Garcia testified that hotel staff told him another person may be in the room. The court agrees that exigent circumstances justified the warrantless entry into the hotel room to prevent the destruction of evidence.

### E. Was a protective sweep of the hotel room justified?

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." Such a sweep is justified only when there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." When determining whether a protective sweep is justified, we consider the totality of the circumstances surrounding the officers' actions. "[W]e 'review the entirety of the agents' investigative tactics,

particularly those leading up to the exigency alleged to have necessitated the protective sweep.'" If reasonable minds could differ on whether the sweep was warranted, we do not second-guess the judgment of experienced law enforcement officers concerning the risks in a particular situation.

*Silva*, 2017 WL 2589436, at *2 (internal citations omitted).

Again, in this case there was a significant amount of cocaine involved and police officers were concerned that someone who may have been in the room was aware of the arrests that just took place outside and could begin to destroy evidence and contraband. In addition, law enforcement officers were aware prior to entry that at least one of the suspects had been armed. A protective sweep was justified under the circumstances. *United States v. Gayden*, 623 F. App'x 214, 216 (5th Cir. 2015) ("[E]xigent circumstances existed because there was a danger that the occupants of [the room] posed as a risk of the destruction of evidence").

### F. Did a search take place prior to the warrant being signed that exceeded the scope of a lawful protective sweep?

Sgt. Garcia testified that he, Det. Valdez, and DEA SA Moreno entered room 400 after the maintenance employee used his master pass to open the door. He further testified that at no time did the maintenance employee enter the room. They announced POLICE and then immediately encountered co-defendant Ibarra-Gonzalez in the room. A firearm that was tucked in his waistband was secured. Sgt. Garcia further testified that a protective sweep was conducted to ensure that no other persons were inside the room. Sgt. Garcia denied that any search of the room was conducted at that time, and specifically denied that any drawers or cabinets were opened. Ibarra-Gonzalez was placed on a chair and Sgt. Garcia contacted Det. Bourcier, who stated that he was en route to obtaining a search warrant. After the protective sweep was conducted DEA SA Moreno left, and Det. Garcia and Det. Valdez remained inside room 400. Shortly thereafter Det. Valdez left the room to get fast food for lunch and returned. Sgt. Valdez

9

testified that on the floor and near a table and chair was a black, Nike sports bag. He testified that the bag remained there untouched until the warrant had been signed by the magistrate. Sometime after Det. Valdez returned with his food, Sgt. Garcia testified that he received a call from Det. Bourcier that a magistrate had signed a search warrant. An evidence custodian was then called to room 400, and Det. Schneider arrived. Det. Schneider then began taking photographs and opened the Nike sports bag, where bundles of cocaine were found.

Det. Moreno testified that after he assisted in entering room 400, he then went to the parking lot to interview Esparza and Lopez. Thereafter, he went back to room 400 to interview Ibarra-Gonzalez. Det. Moreno testified that his notes incorrectly reflected that the search warrant was executed at 3:45 p.m. Det. Moreno testified that he was not actually present in the room when the search was conducted; he was informed by someone that a search warrant had been approved and a search was going to be done.

Det. Schneider testified that he arrived to room 400 and after Sgt. Garcia advised him that a warrant had been signed, he then began to search the room. Det. Schneider testified that he opened the Nike sports bag and found three bricks of cocaine inside, along with a passport. Almost upon completion of the search, he testified that Det. Bourcier entered the room with the warrant in hand.[6]

The Court finds that no search of the black, Nike sports bag was done prior to Det. Bourcier informing Sgt. Valdez that a warrant had been signed.[7]

---

[6] August 31, 2017 hearing
[7] Defense counsel nevertheless had a sound basis for the filing of this motion. SA Moreno's chronology injected a level of confusion. In addition, the affidavit in support of the search warrant could have been more clearly written to state that the seizure of drugs in the car led them to believe that there were larger amounts of drugs in the hotel room.

## G. Did probable cause exist for the search of the hotel room?

Defendant also argues that no probable cause existed for the search of the hotel room. As stated above, the CS was informed that drugs were being stored at a hotel and police officers ultimately followed Lopez to the Marriott Residence, where Lopez was seen by police officers entering the hotel. Lopez and Esparza were thereafter seen walking out of the hotel together, with Lopez clutching his jacket as if trying to prevent something from dropping. Despite the above, Defendant argues that police officers had no probable cause to believe the drugs were being stored in room 400.

To determine probable cause, courts look at the totality of the circumstances to determine if there was "a substantial basis for concluding that a search would uncover evidence of wrongdoing...." *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983). In determining whether probable cause exists a court must "make a practical, common-sense decision as to whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Froman*, 355 F.3d 882, 889 (5th Cir. 2004). In this case, law enforcement officers were aware of what was told to the CS, they followed the co-defendant to the hotel, they saw Esparza walk out of the hotel with a co-defendant carrying something under his arm, because of the CS they knew an attempted drug transaction would be taking place, they witnessed Esparza serving as a lookout or security, they arrested him at the hotel parking lot, and then they became aware of what hotel room he was occupying. The "totality of the circumstances" allowed police officers to seek a warrant because there was "a substantial basis for concluding that a search would uncover evidence of wrongdoing."

Alternatively, the Court concludes that if probable cause was lacking for the search of the hotel room, the good-faith exception applies to the exclusionary rule. *United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005) (citing *United States v. Leon*, 468 U.S. 897 (1984)).

If an officer obtained evidence "in objectively reasonable good-faith reliance upon a search warrant," the evidence is admissible "even though the affidavit on which the warrant was based was insufficient to establish probable cause." *United States v. Satterwhite*, 980 F.2d 317, 320 (5th Cir. 1992). In conducting the good-faith inquiry, courts may examine "all of the circumstances" surrounding the issuance of the warrant. *United States v. Fisher*, 22 F.3d 574, 578 (5th Cir. 1994).

Four circumstances exist in which the good-faith exception does not apply to the exclusionary rule: (1) when the issuing judge issues a warrant in reliance on a deliberately false affidavit; (2) when the issuing judge abandons her judicial role and fails to perform in a neutral and detached fashion; (3) when the warrant is based on an affidavit so lacking in indicia of probable cause as to render an officer's belief in it unreasonable; and (4) when the warrant is so facially deficient that it fails to particularize the place to be searched or the items to be seized. *Leon*, 468 U.S. at 923. In this case, none of the four circumstances to the good-faith exception exists. The issuing judge was not misled nor abandoned his judicial role. The warrant was not so devoid of probable cause, lacking in particularity, nor lacking judicial authority to say that a reasonably well trained officer would have known that the searches were illegal.

**Conclusion**

Considering the above, Defendant's motion to suppress is denied.

SIGNED this 6th day of September, 2017.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE